IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ERIC D. JOHNSON            :      CIVIL ACTION
                           :
        v.                 :
                           :
INDEPENDENCE BLUE CROSS     :      NO. 09-4239


MEMORANDUM

McLaughlin, J.                              May 2, 2013

        This lawsuit arises from the plaintiff's employment
with defendant Independence Blue Cross ("IBC").  The plaintiff,
Eric Johnson, alleges that his superiors at IBC unlawfully
discriminated against him on the basis of race in terms of
various project assignments, workplace recognition, and promotion
decisions.  He also alleges that IBC retaliated against him for
complaining of its discriminatory conduct both internally and to
governmental authorities.  Johnson asserts causes of action under
Title VII of the Civil Rights Act of 1964 ("Title VII"), the
Pennsylvania Human Relations Act ("PHRA"), and 42 U.S.C. § 1981.

        IBC has moved for summary judgment pursuant to Rule 56
of the Federal Rules of Civil Procedure.  After holding oral
argument on December 20, 2012, the Court will now grant IBC's
motion.


I.    Summary Judgment Record

        The facts described herein are undisputed unless
otherwise noted.  Inferences are drawn in the light most

favorable to Johnson, the non-moving party.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).

A.   Johnson's Initial Employment at IBC

Johnson, who is African American, is a graduate of Temple University with a bachelor's degree in actuarial science. Following graduation, Johnson held, among other jobs, actuarial positions at two different companies, General Accident and UnitedHealth Group.  Johnson worked as an actuarial analyst at those two companies for approximately a combined seven years.  At UnitedHealth Group, Johnson was promoted to be an associate manager, supervising its database programming models.  PX A (3/22/11 Johnson Dep.) at 8, 12-15, 17.[1]

In April 2006, Johnson took a job as a lead actuarial analyst with the defendant, IBC, a position that he still held as of March 22, 2011, when his deposition was taken in connection with this action.[2]  Johnson was hired by Mark Cary to work in the department that Cary led.  Cary and Johnson had previously met

_____

[1] "PX" refers to the exhibits submitted by Johnson as part of his opposition to IBC's motion for summary judgment, and "DX" refers to the exhibits submitted by IBC in support of its motion.

[2] The evidence in the record does not establish whether Johnson remains an employee of IBC, although, during oral argument, plaintiff's counsel stated that Johnson "is still there."  12/20/12 Hr'g Tr. at 11.  This fact is not material to the Court's disposition of the instant motion for summary judgment.

when Cary interviewed Johnson and actively recruited him for a
job in the data department at Cary's prior employer, Health
Partners.  Johnson did not take that position.  After becoming a
lead actuarial analyst at IBC, Johnson reported directly to Cary,
who oversaw the department's Medicare Part D projects; however,
Johnson worked on a mix of Part D and Medicare Part C
assignments, spending about 65% of his time on Part D projects.[3]
After three or four months, Johnson was reassigned to report to
Bill Smith, who managed the department's Part C projects, and
who, in turn, reported to Cary.  Cary told Johnson that he
thought it would be better for him to report to Smith, given that
the two had done a lot of work together and because Cary did not
have time to spend working with Johnson.  Johnson continued
working on the same proportion of Part C and Part D projects once
he began reporting to Smith.  Id. at 24, 26-28, 32-35.


    B.    IBC Actuarial Development Program

        IBC offers an Actuarial Development Program, which
provides eligible employees with incentives to take professional
certification examinations offered by the Society of Actuaries.
Participants in the program receive a bonus for passing each

_____

    [3] The parties have not explained the substance of "Part D"
and "Part C" work in any detail.  The only fact relevant to the
Court's decision is that there is a distinction between actuarial
work relating to Medicare Part D and Medicare Part C.

examination.  IBC also gives participating employees paid time for study while at work and reimburses the cost of exam preparation materials, fees, and expenses associated with taking the tests.  DX 1 (3/22/11 Johnson Dep.) at 40, 44-46.

Shortly after starting work at IBC, Johnson learned about the Actuarial Development Program from the program facilitator, Carolyn Young.  Young informed Johnson about the financial and other benefits of the program and encouraged him to apply.  She told Johnson that there were no penalties for failing an examination or failing out of the program, which occurred after receiving three successive non-passing examination scores. Young said that failing scores would not be reflected on a participant's general employment evaluation.  PX A at 40-42. Johnson's supervisors, Smith and Cary, have since confirmed that not participating in the program or performing poorly on the tests was to have no impact on an employee's performance reviews. PX B (4/8/11 Cary Dep.) at 33-34; PX C (2/10/11 Smith Dep.) at 14.

Johnson enrolled in the program in the summer of 2006 and thereafter took two certification exams, one administered in November 2006 and one given in May 2007.  The exams were scored on a scale of zero to ten, with a score of six needed to pass. Johnson was provided time out of his workday to study for both tests.  He did not pass either exam, receiving a failing grade of

one on the November 2006 exam and a score of zero on the May 2007 exam.  DX 1 at 40, 47, 49, 51-52.

Johnson reported his exam results to Young and Smith. Id. at 49-50, 65-67.  When he relayed his May 2007 exam score to them in a July 23, 2007 e-mail, he also stated that he wanted to withdraw from the program because he did not believe that he could successfully continue in it.  Young replied that she was "fine" with Johnson's decision to withdraw but that she wanted to meet with him to discuss his participation in the program.  DX 6 (7/23/07-7/24/07 E-mails Between Young & Johnson).  At their meeting, Young questioned whether Johnson had studied for the test.  Johnson explained that there were other factors that may have contributed to his failing score.  Young informed Johnson that she would release him from the program and that he would need to pass an exam on his own to gain reentry.  PX A at 69, 74. For his part, Smith did not have a problem with Johnson's failing scores and decision to end his participation in the program. Neither in any way impacted Johnson's ability to perform the day-to-day functions of his job.  PX C at 17, 27.

In September, Cary learned about Johnson's test results on the May 2007 actuarial exam and heard from others at IBC, including Young and Smith, that Johnson said he had not attempted to pass the exam.  DX 2 (4/8/11 Cary Dep.) at 35.  On September 25, 2007, Cary met with Johnson and Smith to discuss

-5-

his concerns about Johnson's level of effort in the Actuarial Development Program. At the meeting, Cary stated that he did not think Johnson had tried to pass the May 2007 test, as evidenced by his score of zero. Cary further stated that Johnson's lack of effort in the program demonstrated that Johnson did not care about his job, their department, the company, or the co-workers who had covered for Johnson while he studied for the exam. DX 1 at 79-82. Cary recalls Johnson stating in their meeting that he "did not even attempt to answer any of the questions on the test." DX 2 at 35. Johnson states that, during the meeting, he informed Cary that he had done the best he could on the examination and that he attempted to memorize any questions he did not recognize so that he could study those questions before retaking the test. DX 1 at 82-84.

During their discussion, Cary became visibly angry and "hollered" at Johnson. Id. at 82-83, 85; PX C at 42. Johnson had never heard Cary yell at any other employee. PX A at 85-86. On other occasions, however, Cary had raised his voice at Smith and denigrated Smith's work product in a bullying manner. DX 3 (2/10/11 Smith Dep.) at 43-44; DX 2 at 104. Cary also raised his voice during interactions with another employee, John Forster. DX 2 at 104.

C.  Johnson's Initial Complaints

That day, following his meeting with Cary and Smith, Johnson met with Carole Heys, an employee in IBC's human resources department, and complained that Cary had yelled at him about his performance on the credentialing exams.  DX 1 at 88-89. Later that afternoon, Johnson sent Heys an e-mail stating that Cary's behavior at the meeting had created a "somewhat volatile" work environment and that he wanted to "seek some type of resolution" to avoid any similar interactions in the future. Neither at the meeting with Heys nor in his subsequent e-mail did Johnson claim that he believed Cary's behavior had been racially motivated.  DX 7 (9/25/07 E-mail from Johnson to Heys); DX 1 at 89-90.  Heys began an investigation into Johnson's complaint. PX D (2/11/11 Heys Dep.) at 24.

The next morning, Johnson entered the bathroom and saw Cary at one of the sinks.  When Cary said hello, Johnson did not respond and went directly into a stall.  Johnson "wanted to avoid him."  DX 1 at 91-92.  Following their encounter, Cary sent Johnson an e-mail, advising Johnson against ignoring him when he said hello.  Cary stated that "[t]his isn't child care, it's a business" and that he expected Johnson "to act accordingly." DX 8 (9/26/07 E-mail from Cary to Johnson).

On October 3, 2007, Johnson sent Heys a six-page memo complaining about Cary's lack of professionalism and competence

and requesting to no longer be under his supervision. The memo
detailed the September 25 meeting and surrounding events, and
claimed that Cary's behavior during that meeting had created a
hostile environment. In his memo, Johnson also stated that he
believed Cary had seized on the issue of Johnson's exam
performance to vent a more longstanding frustration Cary harbored
against him. According to Johnson, Cary had failed to heed
Johnson's warning that an outside vendor hired for a previous
data modeling project would not be able to complete the task on
time and that the department should look for other ways to
accomplish the project. Johnson turned out to be correct and
Cary eventually engaged a different independent programmer. In
Johnson's estimation, Cary's failure to listen to him initially
resulted in a waste of department resources. Johnson speculated
that he had made Cary "feel inadequate," and Cary resented him
for that. Johnson did not suggest that the reprimand he received
from Cary was the product of racial discrimination. DX 9
(10/3/07 Mem. from Johnson to Heys).

        Two days later, on October 5, Heys convened a meeting
with Johnson, Cary, and Smith to discuss Johnson's complaints.
At the outset of the discussion, Cary apologized to Johnson for
his behavior at the earlier September 25 meeting. Johnson
refused to accept the apology because he and Cary had not yet
resolved all outstanding issues between them. Since the

September 25 incident, Johnson had heard from Heys that Cary claimed to have been frustrated by Johnson's poor performance all year; Johnson denied that his performance had been poor and suggested that this was a "retaliation situation."  Johnson also disagreed with Cary's view that he had been evasive in answering questions about his actuarial exam scores during their previous meeting.  Cary apologized a second time, and Johnson once again rejected the apology, believing it was insincere.  At some point in the discussion, Johnson characterized Cary's actions during the September 25 meeting as "pure evil."  Johnson requested that, if Cary had remaining questions about his performance on the actuarial exams, those questions be asked over e-mail.  DX 1 at 97-99, 103-04, 106-09, 110; PX A at 100-01.  At the end of the meeting, Heys said the matter was closed, which Cary understood to mean that he would not again ask Johnson to explain his exam performance.  PX B at 54-55.

Heys thought Cary acted inappropriately by waiting two months from the time Johnson reported his May 2007 exam score to speak to Johnson about his performance in the Actuarial Development Program.  She also thought it was improper for Cary to raise his voice when speaking with Johnson.  Heys contacted Cary's supervisor, IBC chief actuary Kathy Galarneau, and instructed Galarneau to speak with Cary.  Cary was ultimately told that his behavior had been inappropriate.  Heys believed

Cary's apology was a satisfactory resolution of the issue and that no further disciplinary action was warranted. PX D at 16-17, 23-24, 26, 30.

    D.    <u>Interim Performance Evaluation</u>

On October 24, 2007, Johnson received an interim performance appraisal prepared by Smith. The interim evaluation listed Johnson's "2007 Accomplishments to Date" and noted Johnson's strengths and growth opportunities. In Johnson's view, the interim evaluation was not fair because it contained "subtle exaggerations" and did not include certain of his accomplishments that had saved IBC millions of dollars. The same day that he received the interim review, Johnson informed Smith that it failed to mention a particular project as an accomplishment. Smith apologized, responding that the omission was an oversight, and immediately revised the evaluation, providing Johnson with a new version also on October 24. DX 12 (10/24/07 2007 Interim Performance Appraisal); DX 1 at 129, 134-36; PX A at 246. The interim appraisal played no role in driving Johnson's eligibility for a salary increase, and Johnson was not demoted in connection with this review. DX 1 at 135.

    E.    <u>Complaints of Discrimination</u>

The next day, October 25, 2007, Johnson submitted a

second memorandum to Heys, as a follow-up to the October 5 meeting. For the first time, Johnson alleged that Cary's actions constituted unlawful harassment, discrimination, and retaliation. DX 11 (10/25/07 Mem. from Johnson to Heys). Johnson had never heard either Cary or Smith make a comment that he considered to be racist. DX 1 at 111. He based his claim of discrimination on the fact that Cary had reprimanded him about his exam scores on September 25 and had shown little respect for Johnson's "talents and contributions" throughout the year, ignoring Johnson's suggestions or failing to seek Johnson's input regarding data modeling projects. His memo stated that, in contrast, Cary circulated an e-mail announcing the promotion of Rita France, a Caucasian employee on a different team in Johnson's department. Johnson was not interested in that particular promotion because it was for a position lower than the one he already held, but he claimed that his contributions to the department were at least as substantial as those made by France and felt that he also deserved recognition. Johnson accused Cary of abusing his authority. DX 11; DX 1 at 119; PX A at 117-18.

One or two days later, Heys called Johnson into her office. She asked Johnson why he had written his memo and if he was trying to get Cary fired. Johnson said that decision was within the human resources department's discretion, but that he would like an investigation into his claims. Heys said that she

would not conduct any such investigation.  DX 1 at 138-39.

Johnson then escalated the issue to Heys' supervisor, Suzanne Driscoll Beckett, in a memo to Beckett and Cary's superior, Galarneau.  Johnson stated that he was not attempting to harass Cary or get him fired and that he simply wanted a fair investigation into his claims.  DX 13 (11/8/07 Mem. from Johnson to Beckett & Galarneau).  Johnson then met with Beckett.  He clarified that he was alleging a claim of racial discrimination against Cary.  Beckett twice asked Johnson if he wanted her to investigate the matter, cautioning that, if she found out these charges were based solely on personal animus, Johnson could be subject to discipline.  Johnson stated that he wanted Beckett to proceed with an investigation.  DX 1 at 144-46.

In mid-January, Beckett met with Johnson, Cary, Smith, and Heys to discuss the results of her investigation into Johnson's claims of harassment, discrimination, and retaliation. She stated that she had found no evidence to support the allegations and then excused Cary and Smith.  After they left, Beckett told Johnson that this matter was now over.  Johnson stated that he felt the investigation had been incomplete and that they had not discussed his 2007 interim performance appraisal.  Beckett responded that she was not going to argue about that issue and told Johnson that it was time for him to move forward and work with Smith and Cary in a productive manner.

Johnson still felt that there were issues that had not been addressed.  Id. at 148-52.  The next month, he filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").  DX 15 (2/22/08 Charge of Discrimination).  Johnson did not discuss with either Cary or Smith the fact that he had filed an EEOC complaint.  PX A at 156-57.


     F.   <u>Best of the Best Program</u>

     IBC maintains a recognition program entitled the "Best of the Best."  An employee designated as the Best of the Best is invited to a luncheon with the president of IBC, receives a plaque, and has his or her accomplishments detailed in a brochure that is distributed throughout the company.  DX 1 at 162-63.  On March 6, 2008, Johnson sent Smith an e-mail listing several of his accomplishments and stating that he believed he was qualified for a Best of the Best award.  Johnson asked Smith to forward his achievements to Galarneau so that he could be considered for a nomination.  DX 16 (3/6/08 E-mail from Johnson to Smith).

     Johnson ultimately did not receive a Best of the Best nomination from Galarneau and felt that he was being overlooked.  He wrote to the CEO and CFO of IBC, informing them of his achievements, that his departmental managers had not recognized them, and that he believed his accomplishments warranted the nominating committee's review.  Johnson's conduct resulted in a

meeting with Galarneau, who expressed displeasure with him for going over her head and contacting the company's chief officers directly.  During the meeting, Galarneau suggested that management may have failed to nominate Johnson for an award simply because they were busy.  DX 1 at 166-68.

Following his meeting with Galarneau, Johnson submitted another complaint of discrimination and retaliation on March 17, 2008.  Johnson rejected Galarneau's claim that management was too busy to recognize his achievements.  He argued that Cary had taken the time to recognize and reward accomplishments by Caucasian employees, Rita France and John Forster, when he circulated e-mails notifying the department of their promotions and citing their departmental contributions.  Johnson noted that both France and Forster had also been promoted.  Johnson alleged that management refused to nominate him for the Best of the Best award due to racial discrimination and in retaliation for having filed his previous complaint of discrimination.  DX 17 (3/17/08 Mem. from Johnson to Galarneau).  Johnson does not know if any of his other peers in the actuarial department were nominated for a Best of the Best award.  DX 1 at 163-64.

Heys investigated Johnson's claim of retaliation.  Id. at 166, 220.  In an e-mail sent to Johnson later that year, IBC human resources personnel informed him that it had investigated all of his claims and had found them to lack merit.

DX 29 (5/31/08 E-mail from Schumacher to Johnson).

       G.    <u>2007 Performance Review</u>

       At the end of March 2008, Johnson received his full 2007 performance review, which had been prepared by Smith. It rated Johnson's performance on a four-tier scale: distinguished, proficient, progressing, and unsatisfactory. Of the fourteen areas evaluated, Johnson received two distinguished ratings, ten proficient ratings, two progressing ratings, and no unsatisfactory ratings. He also received an overall rating of proficient, and, in the concluding comments section, Smith stated that he was "pleased with [Johnson's] contributions to the team's success . . . over the past year." DX 18 (2007 IBC Performance Review for Eric D. Johnson). Johnson's ranking of proficient on his year-end review resulted in a raise and made him eligible to apply for other positions at IBC. Johnson was not disciplined in any manner as a result of his review, and, aside from the wage increase, all aspects of Johnson's job remained the same following his evaluation. DX 1 at 173-74, 197.

       One area in which Johnson received a progressing rating was "Accountability." Smith noted in his evaluation that Johnson never satisfactorily explained why he received a zero on the May 2007 actuarial exam. Smith commented that Johnson had given contradictory explanations and that "some of his comments in

meetings on the topic displayed a concerning lack of
professionalism." DX 18 at D00022-23. Smith added these
comments to the appraisal at Cary's suggestion. According to
Smith, he probably would have said something similar in the
review even without Cary's input. In Smith's view, Johnson had
not provided "a reasonable explanation of what happened." DX 3
at 80-83.

Johnson was able to provide his own assessment of the
review in a Comments section. Johnson characterized the overall
review as "appalling" and claimed that Smith's comment about
Johnson's "unprofessional" remarks at meetings regarding the May
2007 actuarial exam was retaliation for Johnson having filed
complaints of racial discrimination. Johnson again stated that
his review did not contain all of his accomplishments and failed
to mention various times when he "exceed[ed] management's
expectations, and help[ed] other teammates." Johnson further
charged that "management here at IBC display a racist mentality
by resorting to attacks of retaliation and intimidation similar
to the 'dogs and water hoses' used in the 60s to silence those
who dared to stand up for equal rights." Likening himself to the
civil rights activists of the 1960s, Johnson vowed to "pursue
this issue until management has been held accountable before a
governing body that has no vested interest in covering up these
illegal acts." DX 18 at D00029-30.

Johnson also filed another internal complaint alleging
that the review was retaliatory.  DX 19 (3/30/08 Mem. from
Johnson to Heys); DX 20 (4/1/08 Mem. from Johnson to Heys).
Johnson, at some point, told Heys that he believed Cary had
influenced Smith's review.  Based on Johnson's expressed concern,
Heys asked Smith who had written Johnson's review.  Smith
responded that he had written it.  PX D at 52-53.

Johnson later submitted an additional complaint,
alleging that Heys refused to investigate his claim of
retaliation stemming from the 2007 performance review.  Johnson
claimed that Heys' refusal to investigate was also in retaliation
for Johnson's previous complaints.  DX 24 (5/12/08 Mem. from
Johnson to McEndy & Barakat).

H.    Forster's Hiring and Promotion

On November 1, 2006, Cary hired John Forster, a
Caucasian male, to work as a lead actuarial analyst on Medicare
Part D projects.  Forster assumed some of the Part D work that
Johnson had been doing up to that point, taking over one modeling
project that had been "put on hold" and splitting with Johnson
the responsibility for liaising with the IT department.  As a
result, the overall amount of Part D work Johnson was doing
decreased, and thereafter Johnson's work was split evenly between
Part C and Part D assignments.  Johnson also guided or assisted

Forster on certain Part D projects.  PX A at 35-36, 125-26, 245.

Although hired as an actuarial analyst, Forster had actually interviewed for an open Part D manager position.  Cary wanted to hire Forster as a department manager, but was told by Galarneau that Forster had not passed enough actuarial credentialing examinations to serve in that position, having only started the certification process.  DX 2 at 24-25, 103; DX 1 at 247.  Cary still wanted Forster to move into a Part D manager role eventually and expected that he would do so once he passed an extra exam or two.  DX 2 at 103.  Heys also stated that Forster was hired with the expectation that he would be promoted to a management position handling Medicare Part D work.  PX D at 61, 63.

At the time Forster applied for a job at IBC, Johnson was aware that the position of Part D manager was available.  Cary had circulated an e-mail with a description of that position's responsibilities.  PX A at 124-25.  Johnson also knew that Forster was being considered for that manager position and took part in his interview process.  Johnson did not himself express interest in the manager position to anyone.  He believed he was ineligible pursuant to an IBC policy requiring employees to hold their positions for a full year before applying for another job in the company.  DX 1 at 211, 245, 247.

Prior to applying for jobs at IBC, both Forster and

Johnson had experience working on Medicare Part D projects.  Id. at 30; PX D at 61, 63.  Both Forster and Johnson had managerial titles in previous employment but no supervisory experience. DX 1 at 30, 249.  Shortly after hiring him, Cary gave Forster the opportunity to supervise college interns as a way to build up his management experience.  DX 2 at 101-03; PX D at 63.

As Cary contemplated, in January 2008, Forster was promoted to the Part D manager position that had remained vacant since the time of his initial interview.  PX A at 158.  By that time, Forster had further progressed toward actuarial credentialing.  He had passed an additional exam or two, meaning that he had passed more actuarial examinations than Johnson. DX 2 at 24-25, 29-30; DX 1 at 255.  Cary did not post on IBC's internal system that the manager position was open prior to promoting Forster.  DX 2 at 103; PX C at 93; PX D at 68.  Failing to provide company-wide notice of an open position does not violate IBC policy, but Heys considers it to be "poor practice." Johnson had never expressed any interest in promotion to the Part D manager position at any point after Forster's initial hiring. According to Heys, if he had, he would have been considered for the job.  PX D at 60, 66-67.

Forster left his job as a manager in June 2008, approximately six months after being promoted.  He was replaced by a woman named Beth Forman.  PX A at 158-59.

I.   <u>March 2008 Available Promotion</u>

A few months after Forster's promotion, in early March 2008, Cary informed Johnson and another actuary, Ying Zhang, of an opening for a management position in a different unit of their actuarial department. Johnson told Cary that he was interested in the position, and Cary said he would speak with the manager in charge of hiring, Dan Rachfalski, to have him set up an interview. After receiving his 2007 performance report later in the month, Johnson received an e-mail from Rachfalski asking if he still wanted to interview for the open position. Johnson responded that he was no longer interested in the job and withdrew his name from consideration. Johnson did not speak to Rachfalski about his 2007 review, but Johnson felt that Smith's comments in the evaluation had damaged his reputation and sunk any chances of a promotion. He believed the interview process would somehow be humiliating and that he was being "set up." Other than the human resources personnel who responded to his internal complaint regarding the 2007 performance review, Johnson never spoke to anyone about his belief that the evaluation would impact his ability to be promoted. PX A at 180-83; DX 1 at 184, 200, 202.

II.  <u>Analysis</u>[4]

Johnson brings claims of discrimination and retaliation under Title VII, the PHRA, and § 1981.  In his complaint, Johnson also asserted a claim based on the creation of a hostile work environment.  At oral argument on IBC's motion for summary judgment, Johnson conceded that he could not sustain his hostile work environment claim, and it is no longer before the Court. <u>See</u> 12/20/12 Hr'g Tr. at 4.  Each of Johnson's remaining discrimination and retaliation claims is analyzed in an identical manner under all three statutory vehicles.  <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 181-82 (3d Cir. 2009); <u>Atkinson v. Lafayette Coll.</u>, 460 F.3d 447, 454 & n.6 (3d Cir. 2006).

For the reasons that follow, the Court finds that no genuine issue of material fact exists with respect to whether any of IBC's actions constitutes unlawful discrimination or retaliation.  IBC is entitled to summary judgment on both claims.

---

[4] Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The Court must consider the evidence in the light most favorable to the non-moving party.  Once a properly supported motion for summary judgment is made, the burden of production shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986).

A.    Discrimination Claims

The parties agree that Johnson's claim of discrimination is governed by the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that scheme, the plaintiff has the initial burden of making out a prima facie claim of discrimination.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (per curiam) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).  If the plaintiff establishes a prima facie claim, the burden then shifts to the defendant employer to "'articulate some legitimate, nondiscriminatory reason'" for the employment action. Id. (quoting McDonnell Douglas, 411 U.S. at 802)).  Once the defendant satisfies this requirement, to defeat summary judgment, the plaintiff must demonstrate that the defendant's proffered rationale for its conduct was merely pretext for discrimination. Id.  A plaintiff can do so by submitting evidence that either casts doubt upon the truthfulness of the proffered reason or permits a rational factfinder to infer that discrimination was more likely than not a determinative cause of the adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 762, 764-65 (3d Cir. 1994); see also Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 & n.7 (3d Cir. 2010).

A prima facie race discrimination claim requires proof of the following elements: (1) the plaintiff is a member of a

protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  See Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).

### 1.  Failure to Promote

Johnson's claim of racial discrimination against IBC focuses primarily on the fact that Cary promoted Forster, rather than Johnson, to the position of Part D manager.  Although that promotion was carried out in January 2008, Cary determined to promote Forster when he was first hired in November 2006.  To succeed on his discrimination claim, Johnson must demonstrate that Cary's promotion decision in 2006 was discriminatory or was effectuated in a discriminatory manner.

An employer's failure to promote an employee is a sufficiently adverse employment action for purposes of maintaining a claim under civil rights law.  See, e.g., Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)).  In general, an individual must actually apply for the available position at issue to later make out a prima facie claim that the employer's failure to select him for the job was discriminatory.  See Bray v. Marriott Hotels, 110 F.3d 986, 989-90 (3d Cir. 1997)

(citing McDonnell Douglas, 411 U.S. at 802).  The Court of
Appeals for the Third Circuit has stated that courts should not
rigidly adhere to such an application requirement, however,
finding that a plaintiff may press a failure-to-promote claim as
long as he made "every reasonable attempt to convey his interest
in the job to the employer."  EEOC v. Metal Serv. Co., 892 F.2d
341, 348 (3d Cir. 1990); see also Lula v. Network Appliance,
Inc., 245 F. App'x 149, 152 (3d Cir. 2007).

        As noted by defendant's counsel at oral argument,
Johnson's prima facie claim runs into an insurmountable
roadblock.  Johnson never applied for or conveyed any interest in
the manager position eventually filled by Forster.  See 12/20/12
Hr'g Tr. at 15, 17-18.  Johnson was aware that the Part D manager
position was open in 2006.  He received a description of the job
from Cary and in fact participated in interviewing Forster for
that position.  Johnson did not tell anyone that he wanted the
job and did not himself apply to be Part D manager at that time
because he thought he was ineligible under company policy, given
that he had been an IBC employee for less than one year.  DX 1 at
211, 247.  Nevertheless, Johnson knew that Forster was not hired
for the position and that it remained vacant after Forster was
instead hired to be an actuarial analyst.  See PX A at 125.  Yet,
there is nothing in the record to suggest that Johnson later
informed Cary or other supervisors that he wanted to take on that

role at any point prior to Forster's official promotion in January 2008.  Heys, for one, testified that Johnson never expressed an interest in the Part D manager job.  If he had, he would have been considered for it.  PX D at 66-67.

Johnson makes two responsive arguments.  First, Johnson counters in his opposition brief that he did inform Cary of his desire for a management position as early as April 2006.  Pl.'s Opp. at 10.  The deposition testimony to which he cites in support of this proposition, however, reflects only that he told Cary, at his initial interview, that he had once been a manager at another company.  Johnson went on to testify that he "was anxious to get back to the management level" at IBC, but gives no indication that he conveyed this desire to Cary.  See PX A at 248.  Even if he had, an isolated statement of general interest in taking on managerial functions does not amount to making "every reasonable attempt to convey his interest in the job" of Part D manager, in particular.  Metal Serv., 892 F.2d at 348.

Johnson also argues that IBC effectively precluded him from applying for the Part D manager position, due to the fact that Cary did not post an opening for that job at the time Forster was officially promoted in January 2008.  Both the Third Circuit and other courts of appeals have found that it is particularly appropriate to relax the application requirement for a prima facie failure-to-promote or -hire claim where the

employer did not post the vacant position and a prospective applicant could not have learned of the particular opening.  Id. at 349-50; see also Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004); Williams v. Giant Food Inc., 370 F.3d 423, 431 (4th Cir. 2004); Roberts v. Gadsden Mem'l Hosp., 835 F.2d 793, 795-97 (11th Cir. 1988).

The Court finds Johnson's argument unpersuasive given the facts of this case, though.  Although Johnson may not have known precisely when IBC intended to fill the Part D manager position, he knew Forster had not been selected for the job in November 2006.  He had ample opportunity over the ensuing fourteen months to make his interest in the job known and cannot now bring a claim of employment discrimination given his failure to do so.[5]  Cf. Roberts, 835 F.2d at 795-97 (finding a prima facie claim of race discrimination where hospital promoted lesser qualified white employee, rather than more highly qualified black employee, on same day position became vacant and without posting open position).

As Heys notes, Cary's decision not to post an opening

_____

[5] Johnson also has not shown that he was dissuaded from applying by overarching discriminatory promotional practices at IBC.  See Newark Branch, NAACP v. Town of Harrison, 907 F.2d 1408, 1415 (3d Cir. 1990).  No evidence of a settled discriminatory hiring practice has been presented to the Court, and in fact Cary notified Johnson of an opening for a different managerial job within the department and said he would speak to the hiring manager about scheduling an interview for him.  PX A at 180-81.

for the Part D manager position was "poor practice" and did not afford everyone who was interested an opportunity to apply. But this Court's task is not to determine whether IBC acted in a "wise, shrewd, prudent, or competent" manner in its exercise of business judgment. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (citation omitted). The question before the Court is whether a reasonable factfinder could conclude that IBC's decision to promote Forster over Johnson was motivated by discrimination. Id. Johnson's failure to put forth his name for consideration, either formally or informally, dictates that the answer to that question is no.

As a final matter, in his opposition to IBC's motion for summary judgment, Johnson, for the first time in this litigation, claims that IBC also engaged in discrimination when it failed to select him as Forster's replacement several months later, in June 2008. That claim fails for much the same reasons as those outlined above. By the time Forman was hired, not much had changed. Johnson still had not voiced any interest in the Part D manager position to his superiors.

Several months earlier, in March 2008, he had expressed to Cary interest in a different managerial position. He withdrew his candidacy for that promotion the very same month, however, without conveying his reason for doing so to any of his superiors. PX A at 182-83. Johnson offers no evidence

reasonably demonstrating that he later reasserted his desire to be promoted to any position, much less Part D manager.  Given the record before the Court, there is no basis for finding that IBC had any reason to believe that Johnson wanted a promotion to Part D manager prior to selecting Forman for that position.  Moreover, Johnson's suggestion that the position was filled without a vacancy being posted is made without citation to any evidentiary support.

### 2.  Other Employment Actions

Johnson's complaint also makes mention of various "project assignments" and "recognition" decisions that constitute acts of discrimination.  Compl. ¶ 67.  None of these other acts by Johnson's superiors at IBC is sufficiently adverse to form the basis of a discrimination claim.

To constitute a Title VII violation, an adverse employment decision must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."[6]  Storey v. Burns Int'l Sec. Servs., 390 F.3d 760,

---

[6] As noted above, Johnson has conceded his claim based on the existence of a hostile work environment.  Such claims are made out where many separate acts, though perhaps non-actionable on their own, are aggregated to demonstrate the existence of unlawful discrimination in the workplace.  Morgan, 536 U.S. at 115-17; Mandel, 706 F.3d at 165-66.  Having conceded that theory of liability, Johnson can make out a claim of discrimination only by showing that a particular complained of act was serious enough, on its own, to alter the nature of his employment.  See Storey, 390 F.3d at 764.

764 (3d Cir. 2004) (quotation marks and citation omitted). The change in working conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quotation marks and citation omitted).

At all times relevant to this suit, Johnson kept the same job title, performed the same types of assignments, and only saw his salary increase. Although Cary raised his voice at Johnson on September 25, his verbal reprimand was not attended by demotion, reassignment, or a pay cut. Disciplinary action or harsh speech that does not materially change the terms or conditions of employment cannot lay the foundation for a claim of employment discrimination. See, e.g., Mieczkowski v. York City Sch. Dist., 414 F. App'x 441, 446-47 (3d Cir. 2011); Sconfienza v. Verizon Pa. Inc., 307 F. App'x 619, 621-22 (3d Cir. 2008). Moreover, the fact that Cary yelled at Johnson does not evince a discriminatory motive on his part.

The shift in Johnson's work assignments following Forster's hiring also is not sufficiently adverse to underlie a claim of employment discrimination. Johnson estimates that the percentage of his time spent on Medicare Part D work decreased from 65% to 50% once Forster was hired. According to Johnson, Forster took over two projects that he previously worked on, one of which had been "put on hold." PX A at 35-36. These changes

did not materially and adversely impact the nature of Johnson's employment. The relative amount of Johnson's work that focused on Medicare Part C and Medicare Part D may have altered somewhat, but he continued to work on the same kind of assignments and in both Medicare programs even after Forster joined the department.

Nor did Johnson's October 2007 interim evaluation or his 2007 year-end performance review negatively affect his employment in any meaningful fashion. Neither evaluation precipitated any change to his job functions or a pay decrease and he was not disciplined in connection with either appraisal. The interim review was not considered in determining the availability of a salary increase. Although the end-of-year evaluation criticized Johnson's "Accountability" based on his inadequate explanation of a failing May 2007 actuarial exam score and his "lack of professionalism" in meetings regarding that issue, he received an overall rating of "proficient." DX 18 at D00022-23, 28. That ranking resulted in a raise and made him eligible to apply for other jobs at IBC.

Johnson cannot base a claim of discrimination on the fact that his evaluations failed to list all of his work accomplishments or otherwise were not as positive as he believed they should have been. Indeed, when Johnson pointed out that his interim report did not list a particular project through which he had saved IBC millions of dollars, Smith apologized and that day

revised the evaluation to include that project as an achievement. DX 1 at 135-36. Any negative results flowing from the 2007 year-end review were of Johnson's own making. After receiving his review, Johnson decided to remove his name from consideration for a promotional opportunity identified by Cary, based on his belief that the negative aspects of his review had effectively scuttled any chances of a promotion.[7] Johnson did not consult either the manager making the promotion decision, Dan Rachfalski, or anyone else in the actuarial department as to whether his concerns were well-founded before withdrawing from the application process. IBC is not to blame for Johnson's decision.

Lastly, management's failure to nominate Johnson for a Best of the Best award, circulate an e-mail complimenting his performance, or otherwise sufficiently value his contributions to the department did not deny him "serious and tangible" workplace benefits. Storey, 390 F.3d at 764. The Best of the Best award recipient received lunch with the company president, a plaque, and a booklet outlining his or her accomplishments. Winning did not result in a monetary bonus, a raise, a promotion, new

_____

[7] Johnson did make known his belief that the 2007 appraisal was unfair in his written response to that review. Johnson claimed that the review was "appalling" and that it was evidence of the "racist mentality" exhibited by IBC management. Johnson stated that the review exemplified IBC's "attacks of retaliation and intimidation similar to the 'dogs and water hoses' used in the 60s to silence those who dared to stand up for equal rights." Invoking the spirit of the civil rights movement, Johnson declared his intention to "pursue this issue until management has been held accountable before a governing body." DX 18 at D00030.

assignments, or eligibility for any of these things at a later date.  Nor did the e-mails that Cary sent to the actuarial department, praising France and Forster.  Furthermore, with respect to the Best of the Best program, Johnson offers no evidence that his managers nominated anyone for the award, let alone selectively chose comparators of a different race.

        B.    <u>Retaliation Claims</u>

        Retaliation claims, like claims of direct discrimination, are analyzed under the <u>McDonnell Douglas</u> burden-shifting paradigm.  A prima facie claim of retaliation requires a plaintiff to present evidence that (1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  <u>Moore v. City of Phila.</u>, 461 F.3d 331, 340-41 (3d Cir. 2006).  Whether an employer's action is sufficiently adverse is to be judged from the standpoint of a reasonable employee.  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67-68 (2006).  The employer's conduct must be likely to dissuade a reasonable worker from alleging or supporting a charge of discrimination to internal workplace officials, governmental entities, or the courts.  <u>Id.</u> at 68-69.  "[T]rivial harms" and "petty slights" do not constitute actionable retaliatory conduct.

Id. at 68. The Court must consider the totality of the plaintiff's evidence in assessing whether the adverse action at issue was in response to the plaintiff's protected activity. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283-84 (3d Cir. 2000).

Once the plaintiff establishes a prima facie claim, the employer must come forward with a legitimate, non-retaliatory explanation for its conduct. Moore, 461 F.3d at 342. If it does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is false and the true impetus behind the adverse action was retaliation. Id.

Johnson premises his claim of retaliation on the following acts: (1) IBC's failure to promote him to the job of Part D manager in either January 2008 when the position was given to Forster or June 2008 when Forster was replaced by Forman and (2) Cary's instruction to Smith to include comments about Johnson's unprofessional behavior in his 2007 performance review. Pl.'s Opp. at 19-20. These actions all took place after Johnson made an internal complaint of discrimination to IBC's HR department, and at least the decision to hire Forman was made after Johnson lodged a complaint with the EEOC. The Court finds Johnson's retaliation claims unavailing.[8]

_____

[8] It is worth noting that only events occurring after October 25, 2007 could possibly give rise to a claim of prohibited retaliation. Johnson first engaged in protected activity on that date, when he initially complained to IBC's

There is nothing suggestively retaliatory about Cary's failure to promote Johnson to the position eventually given to Forster in January 2008. No link exists between Cary's failure to list the open position and Johnson's complaints against him and other IBC employees. Indeed, Cary has stated, and Johnson has not refuted, that it had been his plan to promote Forster ever since he was hired in November 2006, almost a year before Johnson first lodged any accusation of racial harassment and discrimination against Cary. Nor has Johnson reasonably demonstrated any connection between IBC's decision to hire Forman as Forster's successor and Johnson's complaints against his employer. As noted above, Johnson never expressed any interest in that position. That being so, no reasonable factfinder could determine that IBC's decision to hire someone else for the job was somehow targeted retaliation against Johnson.

Johnson also cannot sustain a claim of retaliation

---

human resources department that Cary was treating him unfairly on the basis of his race. His subsequent complaints to human resources personnel and charge of discrimination before the EEOC constitute additional forms of protected activity. See, e.g., Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006). Johnson's previous complaints against Cary were not founded on allegations of racism, but rather, general unprofessionalism. As such, they did not trigger protection under federal civil rights legislation. Id. ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."); Slagle v. Cnty. of Clarion, 435 F.3d 262, 268 (3d Cir. 2006) (noting that a plaintiff must "allege discrimination on the basis of race, color, religion, sex, or national origin to be protected from retaliatory [acts] under Title VII").

based on his 2007 performance review. As an initial matter, viewed objectively, the evaluation was positive. Again, Johnson was given an overall rating of "proficient," which resulted in a raise and allowed him to apply for other positions at IBC. Inclusion of some negative comments within that review does not reasonably make that evaluation a materially adverse employment action. See Burlington, 548 U.S. at 68. The alleged harm, that these comments foreclosed any promotional opportunities, is based on nothing more than Johnson's own conjecture.

Other courts have found that a partially or wholly negative performance review is not materially adverse, for purposes of a retaliation claim, when unaccompanied by additional adverse impact on the plaintiff's employment. See, e.g., Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (finding negative performance review would not support retaliation claim without evidence that it could affect "position, grade level, salary, or promotion opportunities"); Morrison v. Carpenter Tech. Corp., 193 F. App'x 148, 154 (3d Cir. 2006) (corrective performance review deemed insufficiently adverse); Mikulski v. Bucks Cnty. Cmty. Coll., No. 11-557, 2011 WL 1584081, at *5 (E.D. Pa. Apr. 27, 2011) (finding that positive evaluation was not retaliatory because it also stated plaintiff had, on occasion, acted unprofessionally).

Assuming, for the sake of argument, that Johnson has

carried his prima facie burden, his supervisors had legitimate, non-retaliatory reasons for raising in their review concerns about Johnson's exam performance and behavior at subsequent meetings. According to both Cary and Smith, Johnson never provided a satisfactory explanation as to why he performed poorly on that test. DX 2 at 35; DX 3 at 80-83. Cary, for one, came away from their September 25, 2007 meeting with the impression that Johnson had not even tried to answer questions on the test.[9] At their later October 5 meeting on the subject of Johnson's test performance and Cary's response, Johnson twice refused to accept an apology from Cary, his supervisor's supervisor, for yelling at him at the September meeting. As Johnson acknowledges, in the same meeting, he also referred to Cary's prior conduct as "pure evil." DX 1 at 97-99, 104, 110. Employers are permitted to reprimand their employees for such "breaches of . . . office etiquette," including the failure to respect a superior's authority. Baloch, 550 F.3d at 1200.

Johnson points to several pieces of evidence from which, he argues, reasonable minds could infer that his supervisors' proffered reasons for negatively reviewing him are pretext for retaliation.[10] First, Johnson notes that his interim

---

[9] Johnson states that he told Cary he "did the best that [he] could" and that his strategy was to memorize for future study any questions he did not recognize. DX 1 at 82, 84.

[10] Johnson actually relies on this evidence to demonstrate a causal link between his protected activity and the inclusion of

review in October 2007 made no mention of his failure to explain a poor actuarial test score or a lack of decorum in meetings with his supervisors.  Second, at the conclusion of the October 25, 2007 meeting, Heys stated that the "case is closed" with respect to Johnson's exam performance.  PX B at 55.  Finally, according to Johnson, Cary and Smith told Heys that Cary had nothing to do with writing Johnson's full 2007 evaluation, even though he and Smith discussed including in the "Accountability" section comments about Johnson's inadequate explanation of his test score and poor behavior at meetings on the subject.

    The fact that Johnson's 2007 full-year review was more fulsome than his interim evaluation does not demonstrate that the later appraisal was retaliatory.  The interim performance review is a two-page document, largely devoted to year-to-date accomplishments and day-to-day work, whereas the 2007 year-end appraisal is broader and more detailed in scope, containing fourteen categories in which an employee must be reviewed.  Compare DX 12, with DX 18; PX C at 57-58.  In pertinent part, it contains a section on "Accountability" that is not found in the interim evaluation.  Smith felt the exam-related comments bore on Johnson's accountability.  DX 3 at 82.  Next, although Heys stated that the "case [was] closed" on the exam performance issue

negative comments in his review to mount a prima facie retaliation claim.  Such evidence may just as easily be assessed at the stage of pretext.  See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 234 n.10 (3d Cir. 2007).

in October 2007, it is unreasonable to conclude that this comment barred Cary's supervisors from ever commenting on the incident thereafter.  For his part, Cary interpreted Heys as stating that there was no merit in Cary further discussing the subject with Johnson.  They effectively had to agree to disagree on the propriety of Johnson's conduct.  PX B at 54-55.

Lastly, Johnson misstates the record evidence when he contends that both Cary and Smith told Heys that Cary had nothing to do with the 2007 performance review, although in fact Cary discussed with Smith what to write in that evaluation.  According to Heys, after Johnson complained about Cary exerting undue influence on his performance review, Heys spoke to Smith and asked him whether he had written the whole report.  Smith answered that he had, which, by all accounts, is true, even if Cary offered some input.  There is nothing to suggest that Heys spoke to Cary about the matter.  See PX D at 51-52.  Although Heys agreed that there would be cause for concern if Cary forced Smith to include comments in the review with which he disagreed, there is no evidence that happened here.  Cary told Smith that he wanted to include comments regarding the exam issue in the Accountability section of the review.  Smith did not oppose that suggestion.  To be sure, he stated that he probably would have included something similar had Cary not approached him.  DX 3 at 80-83.

The Court notes that this appraisal came out after Johnson had complained internally and two weeks after IBC had received notice of his EEOC complaint.  The temporal proximity of these events is not, however, "unduly suggestive."  <u>LeBoon</u>, 503 F.3d at 233.  Difficulties between Cary and Johnson and Cary's frustration with what he perceived to be Johnson's apparent lack of effort on the May 2007 exam dated back to September 2007, well before Johnson made any charge of discrimination against IBC personnel.  <u>See</u> <u>id.</u> at 233-34 (finding that evidence of same workplace discord before and after plaintiff's protected activity did not sustain inference that adverse employment action and protected activity were causally related).

In sum, Cary and Smith had a non-retaliatory reason to criticize Johnson in his full 2007 evaluation.  Viewing the record in its totality, as is required, Johnson has not raised a triable issue as to whether that legitimate reason is false and is merely a pretext for retaliation.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant IBC's motion for summary judgment.  An appropriate order issues separately.